LOUIS A. FISK ET AL. *vs*. THE SHORE LINE ELECTRIC
RAILWAY COMPANY ET ALS.

Third Judicial District, Bridgeport, April Term, 1913.

PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, JS.

By written agreement dated December 4th, 1905, the plaintiff acquired
the sole and perpetual right to quarry, sell and dispose of stone
upon the land of one Ford in North Branford, containing one
hundred and thirty-five acres; also the sole and perpetual right to
construct and operate a railroad upon and across the quarry tract
wherever convenient for the development of the quarries thereon.
In consideration thereof the plaintiff agreed to pay Ford, in semi-
annual payments, three cents per ton for all stone sold and disposed
of, and as soon as said railroad was constructed to purchase of
Ford his residence and land adjacent, comprising sixteen acres,
paying $8,000 therefor, of which $5,000 was to be paid when the
first rails were laid on said premises, and $3,000 when quarrying
began, at which date a deed was to be given. The agreement
further provided that it should cease and determine if the plaintiff
should at any time fail to quarry stone on the premises during
the period of five years. Having been delayed until June 30th,
1910, in securing a layout for his railroad and afterward in securing
the necessary rights of way, the plaintiff, on October 28th, 1910,
requested an extension of time for beginning to quarry, which Ford
refused to grant. Thereupon the plaintiff, in order to preserve his·
contract rights, cleared and graded the land on the quarry property,
drilled holes in the rock and, on December 2d and 3d, set off four
blasts, and followed this with a dozen or more between the 5th and
the 15th of the same month. He also began the construction of the
railroad between the two tracts of land on the layout approved by
the railroad commissioners, and before December 4th, 1910, ties
and rails were laid upon a portion of each of said tracts. He then
tendered $8,000 to Ford, and also to his son, to whom Ford had
shortly before transferred the property, and demanded of each of
them a deed of the sixteen-acre tract; and on December 28th he
made a like tender and demand of the defendant Sullivan, president
of the Shore Line Electric Railway Company, to whom the tract
had been conveyed on November 26th, 1910, all of which tenders
and demands were refused. Upon a suit to restrain the defendant
railway company from crossing the sixteen-acre tract with its
railway it was *held:*—

1. That the acts and conduct of the plaintiff in clearing and grading the

Fisk *v.* Shore Line Electric Ry. Co.

one hundred and thirty-five acre tract, and in drilling and blasting the rock therein, constituted "quarrying" within the terms of the contract, although the stone so thrown out was not subsequently crushed and reduced to commercial form.

2. That the finding or conclusion of the trial court, that the plaintiff— while admittedly seeking to preserve his rights and to perform the strict letter of the written agreement—did not act in good faith, was one which the subordinate facts did not support and which the evidence clearly contradicted.

3. That under the terms of the contract the plaintiff was not required to build the railroad extension as a condition of his right to quarry, nor was he bound to complete it before he could become entitled to a deed of the sixteen-acre tract.

4. That the plaintiff, within the five-year period, had complied literally and completely with the requirements of the contract, and was therefore entitled to a conveyance of the sixteen-acre tract from the defendants, all of whom were aware of the existence of the contract and the rights of the plaintiff thereunder.

Argued April 9th—decided July 25th, 1913.

ACTION to restrain the defendants from constructing a railway on land claimed to belong in equity to the plaintiffs, for a decree vesting the title to such land in the plaintiffs, and for damages, brought to and tried by the Superior Court in New Haven County, *Reed, J.;* facts found and judgment rendered for the defendants, and appeal by the plaintiffs. *Error and judgment reversed.*

On December 4th, 1905, George L. Ford of North Branford owned a tract of land of one hundred and thirty-five acres containing a trap-rock quarry, on the north side of a highway, and a sixteen-acre tract on the south side of the highway opposite the one hundred and thirty-five-acre tract. Fisk also owned a large amount of trap-rock land adjoining the one hundred and thirty-five-acre piece. On said day Fisk and Ford entered into the contract, Exhibit *A*, the essential part of which is as follows:—

"1. The said Ford, for the considerations hereinafter mentioned, does hereby give and grant to said Fisk, his

heirs and assigns, the sole and perpetual right to establish quarries and to quarry stone upon the land owned by said Ford situated in said town of North Branford, consisting of one hundred and thirty-five (135) acres, more or less, and bounded north by land of the heirs of Deloss Benton and            Otlett, east by land of            Otlett and highway known as Great-Hill Street, also by land of Thomas Baldwin, also by land of Jane Wheaton, south by main highway to New Haven, also by land of Walter Baldwin, west by land of Louis A. Fisk, also by land of D. M. Smith, also by land of Charles Gedney; and also the right perpetually to sell and dispose of all the stone that may be quarried upon said premises; and said Ford further gives and grants to said Fisk, his heirs and assigns, the sole and perpetual right to construct and operate a railroad and railway to be used in connection with said quarry, over, upon and across said land, wherever it may be convenient to locate the same for the development of said quarries; which said rights are granted subject, however, to a right of way over said land, in favor of Charles Gedney, his heirs and assigns.

"2. In consideration of the above and foregoing, the said Fisk agrees to pay the said Ford three cents (3c) per ton for all stone that may be sold and disposed of by said Fisk, said payments to be made semi-annually on the first days of January and July in each year, and said Fisk further agrees, as soon as said railroad is constructed, to purchase of said Ford his residence in said town of North Branford, situated near said lands hereinbefore described, and the lands connected with said residence, being sixteen (16) acres more or less, and said Fisk further agrees to pay said Ford for said residence and said sixteen (16) acres of land connected therewith, the sum of eight thousand dollars—five thousand dollars when the rails are commenced to be

laid on said premises, and the sum of three thousand dollars when quarrying begins, at which last mentioned date a deed of said land is to be given; and said Fisk further agrees that, in the event that he shall form a corporation for the purposes of quarrying said stone upon said premises, and shall have assigned to said corporation his interest under this agreement, then said Fisk agrees that he will give to said Ford shares of full-paid stock of said corporation, the face value of which shall be $10,000 in addition to the payments hereinbefore agreed to be made; and said Ford agrees to convey said sixteen (16) acres of land to said Fisk or his assigns upon the payment of said $8,000 to be paid as aforesaid. . . .

"4. In the event that said Fisk or his heirs or assigns shall at any time fail to quarry stone upon said premises during the period of five years, this agreement shall thereupon cease and determine."

The sixteen-acre tract and residence were worth $3,000, while the price to be paid therefor under this contract was $8,000.

Fisk's purpose in executing Exhibit A was to construct and operate an extension of the Branford Steam Railroad, of which he was a director and president, from the trotting park terminus in North Branford northerly to the sixteen-acre tract and thence to the one hundred and thirty-five-acre tract.

After the execution of Exhibit A, Fisk, acting for himself and the railroad, began to acquire a right of way for the construction of the extension to the quarries, and on June 30th, 1910, obtained from the railroad commissioners of Connecticut their approval of a layout for the Branford Steam Railroad Company of this extension.

Owing to delays in securing the rights of way, Fisk, on October 28th, 1910, requested an extension of time

for beginning quarrying, under paragraph four of Exhibit *A*. Ford was then negotiating for the sale of these tracts of land to the Shore Line Electric Railway Company, but promised to give Fisk his decision in a short time, but did not do so until November 5th, 1910. In 1909 and prior to October 31st, 1910, the Railway had at various times endeavored to secure from Ford and Fisk a right of way across the sixteen-acre tract, but no agreement had been reached.

George L. Ford conveyed the one hundred and thirty-five-acre and the sixteen-acre tracts to his son, the defendant Frederick, who, on November 26th, 1910, conveyed them to Mr. Sullivan, the president of the Railway, and both the son and Sullivan at the time of said conveyances had full knowledge of Exhibit *A*.

On October 31st, 1910, Fisk, acting for himself and the Railroad, began grading for the extension, and between November 26th and December 1st, 1910, laid ties and rails in the highway between the one hundred and thirty-five-acre and the sixteen-acre tracts, a distance of two hundred and thirty feet, and on December 1st and 2d, 1910, extended the laying of ties and rails sixty feet upon the one hundred and thirty-five-acre tract and thirty-five feet onto the sixteen-acre tract, and between December 5th and 17th, did some further grading on the sixteen-acre tract. Prior to October 31st, 1910, Fisk had graded for the extension about seventeen hundred feet north of the park. He cleared and graded the land and rock and drilled holes for blasting, and on December 2d and 3d, 1910, Fisk caused four blasts to be set off of trap-rock in the one hundred and thirty-five-acre piece, and between December 5th and 15th about a dozen more blasts. No other work in quarrying was ever done on this tract. The rock so thrown out was permitted to remain upon the ground, and none of it has ever been sold, nor has Ford

or his assigns been paid therefor. The blasting and the laying of ties and rails by Fisk were done in the execution of his purpose and intent to perform the strict letter of Exhibit *A*. The construction work on said extension continued until stopped on December 17th, 1910, by letter from Sullivan to Fisk stating his purchase of the two tracts and the fact that Fisk's option had expired by limitation, and prohibiting Fisk from further work thereon.

On December 1st, 1910, Fisk tendered Ford $5,000, and on December 2d, $8,000, stating that said tenders were pursuant to Exhibit *A*. On December 28th, 1910, Fisk tendered Sullivan $8,000, and demanded a deed of the sixteen-acre tract, which tender and demand were refused.

The Railway began construction of its railway across the sixteen-acre tract and continued until stopped by injunction in this action. Subsequent to the tenders Fisk gave the Railroad a deed of a right of way across the sixteen-acre tract and upon the one hundred and thirty-five-acre tract.

In the early part of 1911, Fisk caused to be incorporated a New York corporation for the purpose of opening and operating the trap-rock quarry on the one hundred and thirty-five-acre tract, but has never transferred the title of the land thereto, nor has the corporation done any commercial business.

*Henry Stoddard* and *Howard C. Webb*, for the appellants (plaintiffs).

*William F. Henney* and *Arthur L. Shipman*, for the appellees (defendants).

WHEELER, J. The correction of the finding, applied for under General Statutes, § 797, should be granted in several of the particulars claimed. When Fisk cleared

and graded the land and rock on the one hundred and thirty-five-acre tract for the purpose of subsequently drilling and blasting, drilled holes for the blasts, and fired these during the period from November 28th to December 9th, 1910, he was, in our opinion, engaged in quarrying and in the opening of a quarry. The fact that the stone so thrown out was not subsequently crushed and reduced to commercial form did not, as the trial court seems to have held, deny to the work already done its character of quarrying.

The finding that Fisk, in causing blasting to be done and rails laid, did not act in good faith, is a conclusion which the subordinate facts of the finding do not support, and the evidence clearly contradicts. After entering into this contract Fisk found it difficult to obtain from the General Assembly a layout, and from the railroad commissioners their approval, and to secure the necessary rights of way. He had also nearly completed the grading for the laying of rails from the park north for a distance of sixteen or seventeen hundred feet. His delay in beginning the work was due to the obstacles experienced in, and the delay attendant upon, securing the approval of the layout and rights of way. As a result of this delay, over a month before his contract would expire by limitation, Fisk requested an extension of time for beginning the quarrying under the contract. This was refused because Ford was then negotiating for the sale of these pieces of land included in his contract with Fisk, to Sullivan, president of the Shore Line Electric Railway, which endeavored, but had failed, to obtain from Fisk the rights it desired in these tracts. Ford conveyed these tracts to his son, who in turn conveyed to Sullivan, without the knowledge of Fisk, eight days before the claimed termination of the contract with Fisk. Immediately upon ascertaining his inability to secure the extension of time,

Fisk did everything he could to keep his contract alive. He graded and laid rails upon the one hundred and thirty-five-acre tract to the quarry, and upon the highway adjoining this tract and the sixteen-acre tract. He began laying rails on the sixteen-acre tract, first tendering $5,000 to Ford; he proceeded to grade and clear the land and rock on the one hundred and thirty-five-acre tract, preparatory to blasting. He drilled and blasted and so continued with that and the construction of the railroad until stopped by notice from Sullivan of his claimed right in these two tracts. When he began blasting he tendered the full purchase price of $8,000 for the sixteen-acre tract, worth at the time of the contract $3,000.

Obviously, Fisk was endeavoring to protect the large investment he had made. His only hope of ever getting back, or making profitable, his outlay, was by completing his project of building the extension to the railroad, and so making available for market the traprock on the one hundred and thirty-five-acre tract and then in quarrying and selling the trap-rock. Under such circumstances, an inference that his acts of self-protection were taken in bad faith is so wholly unjustified that we have no hesitation in holding, as matter of law, that the evidence does not tend to support it. A bare recital of the facts in evidence is convincingly persuasive of this.

The conclusion of the trial court, that Fisk had failed to quarry stone within the period of five years of the date of the contract and by its terms the contract determined through the failure to quarry, is disposed of by the correction of the finding. What Fisk did, we hold to have been "quarrying" within the meaning of the contract. The trial court apparently construed the contract to mean that until the railroad for the extension was constructed for the development of the

quarries, the plaintiff could not demand a conveyance of the sixteen-acre tract. This is clearly a misconstruction of the language of the contract. It nowhere provides for the building of the extension, nor does it make, or attempt to make, the beginning of quarrying, or the conveyance of the sixteen-acre tract, dependent upon the construction of the extension.

Under the contract Ford granted to Fisk: 1. The sole and perpetual right to establish quarries and to quarry on the one hundred and thirty-five-acre tract. 2. The right to sell and dispose of all the stone quarried under the contract upon this tract. 3. The sole and perpetual right to construct and operate a railroad and railway to be used in connection with the quarry over, upon, and across this tract, wherever it might be convenient to locate the same for the development of the quarry. 4. The right to lay rails over the sixteen-acre tract after the railroad was constructed upon the one hundred and thirty-five-acre tract and after $5,000 was paid on account of the purchase of the sixteen-acre tract. 5. The right to a deed upon the final payment of the purchase price of the sixteen-acre tract. In consideration thereof Fisk agreed: 1. To pay three cents a ton for all stone sold from the quarry. 2. As soon as the railroad was constructed upon the one hundred and thirty-five-acre tract, wherever it might be convenient for Fisk to locate the same for the development of the quarries, to purchase the Ford residence and the sixteen-acre tract connected therewith. 3. To pay for the same $5,000 "when the rails are commenced to be laid on said premises," and $3,000 when quarrying began. 4. In the event that Fisk should form a corporation to quarry stone and assign to it his interest under the contract, he would give Ford $10,000 of full-paid stock of said corporation in addition to the payments hereinbefore agreed to be made.

The order of events was to be as follows: The building of the railroad upon the one hundred and thirty-five-acre piece. Thereupon the agreement to purchase the sixteen-acre tract became effective. The laying of rails upon the sixteen-acre tract. The payment of $5,000 when the laying of the rails was commenced on this piece. The beginning of quarrying. The final payment of $3,000 when quarrying began. Thereupon the deed to this tract was to be given.

When the railroad was built upon the one hundred and thirty-five-acre tract and the laying of rails was begun on the sixteen-acre tract, the first payment for the purchase price of this tract was due, and when quarrying was begun the final payment was due. Fisk complied, within the five-year period, literally and completely, with the requirements of the contract, and was entitled to the conveyance of the sixteen-acre tract. He had constructed all of the railroad the contract compelled him to. There was no provision in the contract compelling him to construct the entire extension, nor any limitation when the extension should be completed.

Ford may have felt that in providing for the construction of the railroad upon the one hundred and thirty-five-acre tract and its beginning upon the sixteen-acre tract, and in providing for the payment of a price for the sixteen-acre tract, which was nearly three times its worth, he had amply protected his own interests and made it necessary for Fisk to market the stone in order to get back his investment. He did not think it necessary to insert this in his contract, and he cannot be permitted to remake his contract at this time. The parties may have contemplated that Fisk must build the extension in order to successfully transport the trap-rock from the quarry. But the contract does not compel the building of the extension. Subsequent

events (for example, the possible opportunity of shipment by the railway) may make the completion of the extension unnecessary for the purpose of marketing the trap-rock.

Fisk had five years within which to carry out his contract. If he failed to build the railroad across the one hundred and thirty-five-acre tract, his obligation to purchase the sixteen-acre tract never arose. If he built it, his obligation to buy the sixteen-acre tract arose. Ford knew that the opening of the quarry would injure his residence, and he provided for the entire payment of the price at this time.

The trial court construed the intent of the contract to be to secure to Ford an income from the marketing of the trap-rock on the one hundred and thirty-five-acre piece by means of the completed extension of the railroad, and that it was necessary for Fisk to have done this before he could secure a conveyance of the sixteen-acre tract. The purchase of this tract was independent of the royalty to be paid for the trap-rock sold. The two propositions were separate, and so intended.

The deed was to be given when quarrying began. Quarrying had no relation to the marketing of the stone. The giving of the deed had no connection with the marketing of the stone. The payment of a royalty did depend upon this; when marketing should begin is not specified; when settlement shall be made for rock sold is provided for.

There is error, the judgment is reversed and the cause remanded with direction to enter a decree in favor of plaintiff Fisk, providing that defendants Ford and Sullivan convey said sixteen-acre tract by good title to plaintiff Fisk upon payment by him of $8,000.

In this opinion the other judges concurred.